## DETROIT TRUST CO. *v.* MASON.

1. TAXATION—SCAVENGER SALE—MATCHING BID—DEEDS.

   The right to match any bid at a so-called scavenger sale of property to which the State had acquired title for nonpayment of taxes is transferable by assignment or deed (Act No. 155, § 5a, Pub. Acts 1937, as added by Act No. 363, Pub. Acts 1941).

2. TRUSTS—FORECLOSED TRUST MORTGAGE—CAPITALIZATION OF CORPORATION—CONSENT OF COURT.

   Organization of corporation without court's consent with capital of only $50,000 for purpose of owning and operating hotel which trustee had bid in at foreclosure sale with upwards of $3,000,000 deposited bonds and which hotel property had been sold for nonpayment of taxes was not erroneous on part of trustee which had advanced nearly $400,000 of its own funds, notwithstanding the original investment of the bondholders would have justified a larger capitalization, in view of all

the circumstances including constant and continuing losses of large amounts in the operation of the hotel, the trustee's various gratuitous efforts, large prior liens and the fees and taxes of a larger corporation, especially where it is apparent trustee recognized court's jurisdiction in the matter.

3. APPEAL AND ERROR—RECORD—PREJUDICE—QUESTIONS REVIEWABLE.
   On petition by trustee under trust mortgage which had been foreclosed for approval and authorization for reorganization and disposition of hotel property, alleged agreement between trustee and proponent of one plan for disposition of the property is not considered on appeal where it was omitted from the record and no motion was made to amend the record but without prejudice to enforcement of certain rights thereunder.

4. SAME—CHANCERY CASE—MODIFICATION OF DECREE—DISPOSAL OF TRUST ESTATE—COURT APPROVAL OF PLAN—PARTIES.
   On petition of trustee under trust mortgage for approval and authorization for reorganization and disposal of hotel property under which trustee appeared willing to forego collection of a substantial portion of its advancements, and plan as finally approved was not that which trustee had proposed, decree is modified so as to provide that purchaser shall indemnify trustee against all claims against it by lessors of land on which hotel stood where such lessors are not parties to the proceedings.

5. JUDGMENT—PARTIES—RES JUDICATA.
   A decree involving disposition of real estate cannot bind or take away the rights of those not parties to the suit but who hold interests in such real estate.

6. LANDLORD AND TENANT—SALE OF TRUST ESTATE—NOTICE OF CLAIM TO PURCHASER—DEFENSE.
   Purchaser of hotel property, or his assignee, sold by trustee under trust mortgage pursuant to direction of court upon trustee's petition for disposition, is entitled to notice of claim against trustee by lessors of land upon which hotel stood and full rights to direct the defense against these claims.

7. APPEAL AND ERROR—QUESTIONS REVIEWABLE—DISPOSAL OF TRUST ESTATE—PARTIES—RES JUDICATA.
   Claim of individual, who had worked for corporation that had been organized by trustee to own and operate hotel upon which trust mortgage had been foreclosed, for part of capital stock thereof, is not determined by decree entered on trustee's petition for disposal of the property where claimant made no

formal presentation of his claim and failed to establish it, and, since claimant was not a party to the proceedings, any decree entered would not be *res judicata* as to such claim.

8. TRUSTS—DUTY OF TRUSTEE—LIQUIDATION OF ESTATE.

A trustee under a trust mortgage upon foreclosure becomes a liquidating trustee for the benefit of the bondholders and must administer the trust for them with great fidelity and solely in their interest.

9. SAME—DUTY OF TRUSTEE—THIRD PERSONS—BENEFICIARIES—SALES.

A trustee under a trust mortgage after foreclosure is under a duty to administer the trust for the beneficiaries and is not to be guided by the interests of any third persons, hence it would be improper for the trustee to sell the property to a third party for purpose of benefiting such third party rather than the estate.

10. CONTRACTS—CONSTRUCTION AGAINST MAKER OF AGREEMENT.

Language used in a proposal for the sale of property by a liquidating trustee must be most strictly construed against the person responsible for it.

11. MORTGAGES—TRUST MORTGAGES—FORGIVING PORTION OF CLAIM—CONSIDERATION—STATUTES.

Claim that written agreement by trustee under trust mortgage, made as part of its proposal to court for disposal of the property upon which the mortgage had been foreclosed, whereby trustee forgave a part of its individual claim for advancements, services and as holder of some of the bonds, was unenforceable because without consideration is not tenable in view of statute relative to agreements to change, modify or discharge contract, obligation, lease, mortgage or other security interest in real or personal property without consideration (Act No. 238, Pub. Acts 1941).

12. CONTRACTS—ACCEPTANCE BY COURT.

A commitment made in court is not subject to arbitrary withdrawal after the court had stated that it would accept it.

13. TRUSTS—EQUITY—OFFER OF TRUSTEE TO FORGIVE PORTION OF CLAIM AGAINST ESTATE—ACCEPTANCE BY COURT WITH MODIFICATION.

A trustee under a trust mortgage which had been foreclosed, also interested in the property as a creditor for advancements and services as well as being a bondholder in its individual ca-

pacity, which made an offer to forgive a substantial part of
its claim in its proposal for disposal of the property sub-
mitted to the court for approval as made or as modified by the
court was bound by such offer when court orally accepted same
with a modification as the trustee was in a court of equity
and was bound to do equity.

14. Mortgages — Chancery Foreclosure — Waiver — Equity —
Courts.

Ordinarily a court cannot make a mortgagee in a chancery fore-
closure suit waive part of its mortgage as the obligation to
do equity does not extend to foregoing a legal claim.

15. Trusts—Disposal of Estate after Foreclosure of Trust
Mortgage—Acceptance of Trustee's Offer to Forgive Part of
Claim Against Estate.

After foreclosure of trust mortgage, where trustee, in petition
for disposal of the property, had proposed to forgive a sub-
stantial part of its claim against the property for advance-
ments and services and as bondholder in its individual ca-
pacity, court's acceptance of such offer was not inequitable
where modification by court did not affect amount trustee
agreed to accept but did result in raising amount realized by
holders of certificates of deposit of bonds from 65 cents to
about $12 per $100 unit.

16. Same—Equity—Trust Mortgage—Certificates of Deposit of
Bonds.

In the foreclosure of a trust mortgage and disposal of the prop-
erty a court of equity has the right and duty to look after
the interests of the holders of certificates of deposit of bonds
issued under the mortgage.

17. Same—Protection of Interest of Bondholders and Succes-
sors—Appointment of Friend of the Court.

Since a trial judge may not solicit plans for disposal of prop-
erty upon which trustee had foreclosed a trust mortgage in
chancery, where it is reasonably apparent that the interests of
the bondholders or their successors may be better protected,
in the absence of timely objection, it was not improper for the
court to appoint a friend of the court to perform certain labors
and make examinations and provide for his payment, the court
reserving to itself the exclusive right to make final determina-
tion after submission of recommendations by the friend of the
court.

18. SAME—APPOINTMENT OF FRIEND OF THE COURT—OBJECTION BY TRUSTEE.

Trustee under trust mortgage, which foreclosed mortgage and then petitioned court for authority to dispose of the property, was foreclosed from making objection to appointment of the friend of the court for purpose of obtaining other plans and making recommendations after it became apparent to the trial court that the trustee and the attorney for the bondholders' committee declined to make further efforts to make an arrangement whereby the holders of certificates of deposit of bonds would realize more on their investment and where no objection was raised at the time of his appointment.

19. SAME—DISPOSAL OF TRUST ESTATE AFTER FORECLOSURE—COLLOQUY—ORDER OF COURT.

Claim that final order of trial court did not properly incorporate proposal or offer submitted by appellee for hotel property being disposed of by trustee after foreclosure of trust mortgage thereon was without merit in view of colloquy in open court removing all ambiguity in the matter.

20. SAME—JURISDICTION OF COURT—FORECLOSURE OF TRUST MORTGAGE—BONDHOLDERS' DEPOSIT AGREEMENT—DISPOSAL OF TRUST ESTATE.

A court having jurisdiction of proceedings to foreclose trust mortgage in chancery may properly provide for disposal of trust estate notwithstanding the opposition of the holders of certificates of deposit representing a minority of the bonds deposited as the certificate holders are bound by deposit agreement empowering bondholders' committee to protect their interests and which committee participated in proceedings for disposal of the trust estate.

21. SAME—PLAN FOR DISPOSAL OF TRUST PROPERTY—PROFITS.

Sale of trust estate consisting of hotel property to purchaser who presented plan whereby holders of certificates for deposited bonds would presently receive a larger amount than any other plan proposed was proper and within jurisdiction of court where 14 years had elapsed since bondholders or their successors in interest had realized anything from the trust and whether present profitable operation of hotel would continue after termination of war was speculative.

22. SAME—PLANS FOR DISPOSAL OF TRUST ESTATE—DISCRETION OF COURT.

Plan for disposal of trust estate, consisting of hotel property upon which trust mortgage had been foreclosed, whereby cash was to be paid by purchaser for outstanding stock of corpo-

ration which had been formed by trustee to own and operate hotel, conditioned upon trustee forgiving a substantial part of its claim against the estate as it had proposed in its own plan for disposal and under which the purchaser took his chances on obtaining concessions from lessors of land on which hotel stood, *held*, preferable, under the circumstances, to plan whereby corporation was to pay off trustee, other certificate holders were to share in trustee's individually-owned certificates of deposit of bonds, and corporation was to continue operation of the hotel.

23. CORPORATIONS—ASSUMPTION OF LIABILITY FOR RENT—SALE OF TRUST ESTATE.

Corporation, organized to own and operate hotel property upon which trustee had foreclosed trust mortgage, was not relieved of liability for rent to lessors of land on which hotel stood merely because purchaser under plan for disposal of trust estate became owner of capital stock of corporation, hence where purchaser and his assignees are required to assume any individual liability of the trustee to such lessors, the trustee may not object to acceptance of such purchaser's plan rather than its own because of its continuing individual liability.

24. TRUSTS—SALE OF ESTATE AFTER FORECLOSURE OF TRUST MORTGAGE—CONTINUING JURISDICTION OF COURT.

Upon approval of sale of hotel property which had come into trust estate through foreclosure of trust mortgage, trial court properly retained jurisdiction to settle further questions that may arise including the mechanics of carrying out its decree.

WIEST, J., dissenting in part.

Appeal from Wayne; Brennan (Vincent M.), J. Submitted April 11, 1944. (Docket No. 19, Calendar No. 42,660.) Decided June 30, 1944. Rehearing denied September 5, 1944.

Bill by Detroit Trust Company against Fred H. Mason and others to allow sale of Tuller Hotel property subject to making report of sale. On petition for approval of refinancing plan. Louis H. Schostak and others presented their plans. From decree adopting Schostak plan, plaintiff, bondholders' committee, Abraham Skaff, Morris and David Pollack, Shelden A. Wood and others, Frank

Holznagle, Sr., John A. Taffee, David Johnson and Gertrude A. Luce appeal.  Modified and affirmed.

*Butzel, Eaman, Long, Gust & Bills* (*Thomas G. Long* and *A. Hilliard Williams,* of counsel), for plaintiff.

*Henry Meyers, amicus curiae, in pro. per.*

*Frederick J. Ward,* for Abraham Skaff.

*Fischer & Fischer,* for Morris and David Pollack.

*Wiley, Streeter & Meyer* (*Charles H. Watson* and *Peabody, Westbrook, Watson & Stephenson,* of counsel), for bondholders' committee.

*Wiley, Streeter & Meyer* (*Fildew & DeGree,* of counsel), for defendants Albert F. and Shelden A. Wood.

*Shapero & Shapero* (*Frank W. Donovan,* of counsel for Louis H. Schostak), for Louis H. Schostak and Alvin E. Bernstein.

BUTZEL, J.  In order to present the issues more fully in the instant case, we find it necessary to refer to some of the pertinent facts.  It is, however, impossible to set forth all the details as they appear in a voluminous record and are discussed in 12 briefs.  In coming to our conclusions, we have carefully reviewed all of the facts.  The answers to many of the questions raised will be found in our discussion of the facts.

On August 20, 1929, suit was brought to foreclose a mortgage for $3,500,000 given January 2, 1926, to the Detroit Trust Company, as trustee, on the Tuller Hotel which was built on slightly more than

eight and one-half lots centrally located in the city of Detroit, Michigan. All but 60 feet fronting on West Adams avenue were owned in fee by the mortgagor. The 60 feet, consisting of two half lots, were held by the mortgagor on 99-year leases. The present lessors are the Koch and Longyear estates, each owning 30 feet of the leased property. The Tuller Hotel fronts on West Adams, Park and Bagley avenues.

At the time of the foreclosure sale, there were still $3,300,500 of bonds outstanding. A bondholders' committee was formed and the property purchased for over $3,000,000 by the trust company as trustee for the bondholders who had deposited their bonds with the committee which, in turn, issued certificates of deposit to the depositors. The bonds, so deposited, were applied toward the payment of the purchase price at the foreclosure sale. The trust company advanced $42,719.32 to pay nondepositing bondholders, and by agreement was given a prior lien for this amount. The trust company also owned in its own right a large amount of bonds, which it deposited. The bondholders' committee consisted of Fred H. Mason and Harry L. Stanton and others. Defendants Mason and Stanton, only remaining members of the committee, were made defendants in all subsequent court proceedings. Mr. Stanton is an officer of the Detroit Trust Company.

Upon purchasing the hotel property the trust company issued a declaration of trust to which the bondholders' committee duly assented. It provided that all funds advanced by the trust company were to be a prior charge on the trust estate and superior to any rights or interests of the *cestuis*. Many bondholders sold their certificates. The claim was made at the hearing of the instant suit that some

of those who acquired certificates in recent years purchased them at two cents on the dollar.

On June 16, 1939, the trust company filed a bill of complaint making the bondholders' committee and the certificate owners defendants. It alleged that there was due it for advances the sum of $384,639.86, which included the amount it had paid to nondepositing bondholders at the time of the sale. It further alleged that the property held in fee had been sold and bid in by the city of Detroit for various taxes, aggregating $132,825.91, and that there were other unpaid taxes against both the property held in fee and the leasehold in the amount of $565,953.59; that notwithstanding the fact that the hotel was managed by one of plaintiff's employees, no part of his salary had been repaid to plaintiff; that during the many years plaintiff had charge of the trust it had not received any compensation for services rendered either in the operation of the hotel or in the management of the trust; that the revenue from the hotel had been insufficient to maintain all portions thereof in usable condition, so that sections of it had to be closed at various times; that the results of the operation of the hotel during approximately 10 years had made it apparent that the tax obligations could not be discharged or any of the advances made by plaintiff repaid except by sale of the property to a purchaser who could refinance the charges against the property as well as rehabilitate it. It further stated that the trust company was in imminent danger of losing the entire sum of $384,639.86, which it had advanced, unless afforded the aid and protection of a court of equity. It therefore prayed that it be given the right and authority to sell the property subject only to making a report of any proposed sale and obtaining the approval of the court in advance

of the closing thereof. A decree was filed October 31, 1940, granting plaintiff the relief prayed for but reserving jurisdiction in the court.

Some time thereafter the title to the property held in fee became vested in the State of Michigan on tax sale. For a time plaintiff leased the property from the State. The only remaining asset, with the exception of the personal property of the hotel, some accounts receivable, cash and the leaseholds, consisted of the preferential right to match any bid for the property when sold at the scavenger sale. This right was the main asset of the trust estate. The right could be transferred by assignment or deed. Act No. 155, § 5a, Pub. Acts 1937, as added by Act No. 363, Pub. Acts 1941 (Comp. Laws Supp. 1943, § 3723–5a, Stat. Ann. 1943 Cum. Supp. § 7.955 [1]). The sum of $351,962.25 was required to bid in the property. Plaintiff did not care to advance such amount to an unsuccessful and impoverished trust, nor to obligate itself personally for a very large amount on a land contract to repurchase the property from the State. Without asking or securing the consent of the court, but with the approval of the bondholders' committee, the Detroit Grand Park Corporation (hereafter called the Grand Park) was formed with a capital of 50,000 shares of common stock having a par value of $1 per share. Mr. Stanton, an officer of the plaintiff, and one of the two remaining members of the bondholders' committee, became president of the Grand Park. All of the stock was issued to the bondholders' committee, but immediately pledged to plaintiff as security for the amounts due it. The full and exclusive voting rights were also assigned to plaintiff. The personal property of the hotel and the right to match the highest bid at the scavenger sale were transferred to Grand Park. A chattel mortgage on the personal

property was given plaintiff. Grand Park purchased the property from the State on land contract. Ten per cent. of the amount of the bid was paid to the State and the balance was made payable over a period of 10 years. On March 1, 1943, the amount had been reduced by monthly payments to $284,135.60.

Plaintiff is criticized for not having sought the consent of the court and the certificate holders before transferring the right to bid to the $50,000 corporation. Plaintiff in filing its subsequent petition did not regard the court as being divested of the subject matter, although the outward form of the corpus of the trust had changed. Fault is also found because the certificate holders had no opportunity to be heard, and that possibly some method might have been devised other than turning the property over to a $50,000 corporation. It is contended that had a successor trustee been appointed or a corporation with a much larger capital been formed, and should the hotel thereafter be operated on a profitable basis, very serious income tax problems, including possibly that of payment of a very large amount for excess profit taxes, might have been avoided. On the other hand, the attorneys for the bondholders' committee now claim that the formation of Grand Park with the consent of the bondholders' committee ousted the court of all further jurisdiction. Plaintiff did not believe it did when it filed its subsequent petition in the chancery court, nor did the bondholders' committee when it answered the petition and asked that it be granted. We agree with plaintiff that the court retained jurisdiction. Nor can we criticize the plaintiff for forming a corporation with a capital of $50,000. The past history of the hotel, its almost constant and continuing losses of large amounts,

the considerable amount of money, time and effort plaintiff expended without any repayment, and the large prior liens against the property indicated beyond any question that there was some doubt whether any equity would be saved for the certificate holders, or whether plaintiff could recover the amounts it had advanced. With the large amount of fees and taxes that a corporation with a large capital would have had to pay on its organization and subsequent operation, plaintiff might have been subjected to criticism had the capital been larger, even though the original investment of the bondholders would have justified a larger capitalization.

On April 1, 1943, the Detroit Trust Company filed a petition for approval and authorization for the reorganization and disposition of Tuller Hotel property. It set forth the former court proceedings and the final decree of the court, and alleged that all the holders of certificates of deposit were and still are parties defendant in the case, and that the court had reserved jurisdiction to approve any sale or disposition of the property. It recited the assignment of the bidding right to Grand Park and stated that the hopeless insolvency of the trust prevented plaintiff from assuming any liability to the State on the land contracts for the purchase price of the property at the scavenger sale. It further stated that the Koch and Longyear leaseholds were being maintained on a rental basis of $14,000 a year plus taxes on these parcels; that the claims against the property consisted of a balance due the State of Michigan on land contracts as of March 1, 1943, amounting to $284,135.60, and the sums due the Detroit Trust Company for advances to the trust aggregating $384,639.86; that the Koch and Longyear estates' rentals, accruing under leaseholds over a period of years and in dispute, were the sum of

$94,909.39; and that also the sum of $9,000 was due the bondholders' committee, their counsel and the Chicago depositary. This made a total of $798,945.24. The petitioner further stated that during the past 10 years of its operation all revenues which might have been available for paying debts had been used for rehabilitation of the property; that in addition to not receiving any compensation for its services or responsibility incurred, it had not received any payment on account nor had interest been charged on the amounts advanced by it.

It further stated that all efforts to obtain new funds had been futile, that the trust company had been willing to subordinate its claims to any new loan and extend the time for payment for the period of the loan, that there was no possibility of creating an equity value for bondholders unless the enumerated claims were paid and new funds obtained for the purpose of rehabilitating the property. It further stated that the continued operation of the hotel under conditions that had previously prevailed and without refinancing to the extent necessary for payment of obligations and necessary for rehabilitation of the property would result only in the sale for the best price available which would be a sum substantially less than the total obligations. Petition was filed on April 1, 1943, when the hotel evidently was no longer losing money, probably due to war conditions, for at the end of the following month the financial statement indicated a profit of $130,245.38 from which it seems to be conceded that a 40 per cent. tax would have to be deducted. The petition further stated that until recently no one had offered to venture an investment of any amount in the property. The Jefferson Standard Life Insurance Company of North Carolina, hereinafter called Jefferson Standard, proposed to invest in the

hotel on the condition that the paramount claims against the property could be eliminated. The proposal had been developed so as to create a potential equity for the former bondholders. Plaintiff, on condition that the plan be approved, offered to accept $108,000 for its advances amounting to $384,639.86 and for its expenses, and to further waive interest and other compensation for services, and further to cancel certificates of the face value of $186,700 representing what it owned in its individual corporate capacity. The plan proposed by Jefferson Standard for the disposition and reorganization of the property was to furnish Grand Park with the sum of $500,000, $470,000 of which the Jefferson Standard would loan on a first mortgage payable in 15 years with 6 per cent. interest, small amounts to be payable on principal semiannually. The $30,000 additional would be paid into the corporation by Jefferson Standard in return for 60 per cent. of Grand Park's outstanding capital stock of $50,000, thus leaving 20,000 shares of the par value of $1 each for the certificate owners. Figuring the stock as worth par, this would be a return of approximately 65 cents for every $100 originally invested by the bondholders.

From the $500,000 thus realized, plaintiff would receive the sum of $108,000, and the State of Michigan would be paid the balance due it on the contracts arising out of the scavenger sale. The petition also stated that the Koch and Longyear estates would release their claims of approximately $94,909.39 in consideration of new leases being entered into for the term of 18 years at a rental of $18,000 per year plus an additional 12 years at a rental of $16,000 per year. There also would be sufficient left to pay the past-due taxes on the leasehold properties, as well as the sum of $9,000 to members

of the bondholders' committee, its attorneys and depositaries. It was further proposed to reorganize the Detroit Grand Park Corporation so as to provide for five directors, two of whom would represent the certificate holders, and also increase the number of shares of common stock to be issued on a 60–40 per cent. basis, so that after the cancellation of the certificates held by plaintiff, 31,138 shares would belong to certificate holders and 46,707 shares to the Jefferson Standard.

Plaintiff, as petitioner, further stated that it did not make any representations as to what had been accomplished or would be accomplished by the proposed plan, but it offered to accept $108,000 in full for the various items hereinbefore set forth in the firm belief that the total sums due it could not be obtained by sale of the property or otherwise and such reductions in the plan proposed afforded the only possible means of creating some equity or potential equity for certificate holders which would have a material value. Plaintiff stated that the plan proposed would leave the property encumbered only by the mortgage of $470,000. It stated that the continued operation of the hotel property under the present financial arrangement was bound to result in a sale of the property for a sum substantially less than the total obligations. Petitioner further alleged it had been unable to obtain or develop any other plan which afforded the certificate holders the opportunity of salvaging anything. The offer of plaintiff to reduce or waive part of its claim was conditioned upon the approval and consummation of the plan which petitioner recommended as being fair and reasonable in view of the circumstances and for the "best interest" of the certificate holders and other parties in interest. Petitioner therefore prayed that the court, in the exercise of the power

reserved in the former decree to modify and change the same or to make other or further decree, authorize the carrying out of the plan thus set forth in all "the particulars or as to this court shall seem expedient and for the best interests of all concerned." Order to show cause was issued.

One group of certificate holders opposed the granting of the petition; another certificate holder proposed a different plan. Messrs. Mason and Stanton, the remaining members of the bondholders' committee, filed an answer in which they did not claim the court was without power. They expressly stated that they had participated in the formation of the plan and that it offered the holders of certificates of deposit of bonds "the greatest possible interest in a solvent corporation that is obtainable." They further stated that unless they obtained such shares of stock in such a solvent corporation their interests, and consequently, the interests of holders of certificates of deposit, "are worthless."

The court after a hearing and the arguments of counsel filed a supplemental decree granting the petition to carry out the Jefferson Standard plan. Very shortly thereafter appellant Skaff, holding a large amount of certificates of deposit, which it is claimed he purchased at two cents on the dollar, filed a motion to set aside the supplemental decree and suggested that efforts be made to secure a mortgage from the R. F. C. Mortgage Corporation on a new application so as possibly to create a greater equity for the certificate holders. At the hearing of the motion, there was considerable difference of opinion as to whether such a loan could be obtained. The court thereupon appointed Henry Meyers, an attorney, as friend of the court to investigate the possibility of obtaining such a loan and to report his findings to the court. The order appointing the friend stated that the court was desirous of obtain-

ing the best possible solution and was particularly anxious about the interest of certificate holders, and that the court should have a report from an officer of the court. The court ordered all persons before it to cooperate with the friend of the court and furnish him all information necessary in connection with the presentation. Three days later, an order was entered extending the powers of the friend of the court and instructing him to solicit proposals in writing from all parties for the reorganization or sale of the property in a manner that would be more beneficial to the bondholders than the one theretofore approved, and that such offers be submitted to the court by the friend with his recommendations. The record shows no objections whatsoever were made to the order appointing a friend of the court, or his active participation thereafter in accordance with the order of the court. He notified parties whom he thought might be interested and as a result a number of other proposals were received, all predicated, however, upon plaintiff accepting the $108,000 as indicated in its proposal, in consideration of an absolute release of all claims and the cancellation of certificates of deposit. Proposals were solicited by the friend of the court and sealed bids were opened at a specified time. All of the proposals were submitted to the court with the recommendation of the friend of the court. We shall discuss the various proposals to the extent we believe necessary in connection with the appeals of the proponents of such offers.

The proposal of one Louis Schostak was deemed the best by the court and an order was made directing its consummation by plaintiff and the necessary defendants.

Early in the proceedings the Jefferson Standard made a new proposal and offered to give the certificate holders the option of taking either their pro

rata share of 40 per cent. of the stock of the Grand Park or the sum of $7 for each $100 face value of bonds deposited and represented by the certificates. Jefferson Standard further amended its original plan by offering a mortgage loan of $500,000 at 5 per cent. interest at maturity with serial payments to be made as in their first plan. They later offered to pay $300,000 for the entire 50,000 shares of Grand Park stock. After deducting $9,000 miscellaneous fees, there would remain for the 31,138 shares held by certificate holders who would share in the proceeds (the trust company's share being eliminated) about $9 per share. In addition the certificate holders were given the option to purchase one share of stock for every $100 of the face amount of their certificate at $6 per share. The attorney for the Detroit Trust Company stated that it would accept $108,000 if this latter plan were approved.

The final offer of Louis H. Schostak was to acquire all of the stock of Grand Park by purchasing the 31,138 shares outstanding at a price of $12.30 per share conditioned solely upon the acceptance of an additional $108,000 by the Detroit Trust Company in return for a waiver of all of its claims, including the cancellation of the $186,700 of certificates owned in its individual corporate capacity. This would enable Schostak to become the owner of the entire outstanding capital stock of Grand Park on purchasing the 31,138 shares. It seems to be conceded that this would net each certificate holder approximately $12 per share for every $100 of bonds represented by the certificate. A holder of $13,000 certificates of deposit, represented also by the attorney for Schostak, filed a separate petition asking for the approval of the Schostak offer. An order making Grand Park a defendant was entered. The court considered the various proposals, approved the

Schostak proposal and ordered the closing of the trust and disposal of the property and the corpus therewith. The Detroit Trust Company was ordered to accept $108,000 in accordance with its proposal and to perform the other details necessary to make the transfer effective.

On October 26, 1943, the day after the court orally stated that it approved the Schostak offer, plaintiff filed a withdrawal of its commitment to accept $108,000.

An important factor in the Schostak proposal is the fact that it was made on the understanding that Schostak and those whom he represented would be obliged to take their chances in making proper adjustment with the lessors of the two 99-year leases and the settlement of all claims thereunder. Unless some agreement already exists or can be reached, it might become necessary to divide the building and close off that part of the hotel on the leased lots, which part contains the elevators and other necessary apparatus of the hotel. If the building on the leasehold property is separated or is torn down and used as a parking lot, it is claimed the leasehold properties would not bring nearly as large an income as is provided for under the revised leases as contained in the original petition of plaintiff. There is some claim on the part of Schostak's attorney that the holders of the 99-year leasehold are legally bound to accept the new leases as set forth in plaintiff's petition. It is further claimed that the lessors, if they have not already bound themselves by agreement, might be influenced by other factors including the responsibility of the parties with whom they dealt.

Schostak, as appellee, claims that the Detroit Trust Company in its individual capacity is solely a creditor and when it disposes of its claim, its re-

sponsibility entirely ceases. Schostak attaches to his brief an agreement between the trust company, Grand Park and the lessors by which it is claimed that any liability as might have existed has become solely that of the Grand Park Corporation. This new agreement is not part of the record and attorneys for plaintiff asked that it not be considered notwithstanding an affidavit of the attorney for Schostak claiming that it was omitted from the record because of a misunderstanding between counsel. It is not part of the record. No motion was made to amend the record and it will not be considered but without prejudice to any rights that any purchaser or his assignee might be able to enforce as owner of all of the stock of Grand Park and to any additional rights the purchaser or his assignee might have upon being subrogated to plaintiff's rights upon payment of the $108,000. On the other hand, inasmuch as this case is being heard *de novo,* the decree should be modified so as to provide that the purchaser and his assignees shall indemnify and save harmless the Detroit Trust Company against all claims that might be made against it by the lessors under the 99-year leases if such claims exist. Neither the Koch nor Longyear estates are parties defendant in the instant proceeding. The decree cannot bind them or take away any rights they or the purchaser or his assignee may have. The original and amended propositions of the Jefferson Standard set forth the fact that satisfactory arrangements had been made with the lessors of the 99-year leases. The trust company on disposing of its claims should be protected against any possible claim or liability because of the leases. On the other hand, the purchaser and his assignee shall be given notice of any claim and shall have full rights to direct the defense against these claims.

It appears from the record that one Charles W. Morris makes some claim, indefinite in character and amount, for services in connection with the Jefferson Standard proposal. He was drawing the sum of $600 a month for services from the Detroit Grand Park Corporation for a number of years. It developed during the hearing, for the first time, that the Jefferson Standard, if its proposal was accepted, had agreed to transfer to Morris 9 per cent. of the capital stock of the Grand Park Corporation. Morris testified that he had a claim of some kind but made no formal presentation of it and from the testimony he failed to establish it. As he was not a party to the proceedings, any decree would not be *res judicata* as to such claim. It is, however, very significant that when the plaintiff filed its original petition for approval and authorization for the reorganization and disposition of the Tuller Hotel property, it set forth existing claims and made no mention whatsoever of any amounts due Morris, thus indicating that if Morris has any claim, it is against the Grand Park.

In the final decree the court reviewed the various propositions and declared that it had jurisdiction of the parties and subject matter at the time the Detroit Trust Company agreed to accept $108,000, that such proposal was subject to the approval of the court and that the proposal was made for the benefit of the certificate holders so that they might realize something on their certificates. The court further found that the Detroit Trust Company had agreed to accept $108,000 in accordance with the Jefferson Standard proposal, which would provide $9 a share to the holders of certificates, that the Schostak plan would enable the certificate owners to realize substantially more than $9, and that Schostak through his attorney in open court offered to complete the

proposed arrangements with the Koch and Long-
year estates. It further stated that the trust com-
pany having come into court praying for relief, may,
in turn, be required to do equity in the premises;
that it recognized its obligation to the holders of the
certificates of deposit when it filed its first petition
for the acceptance of the so-called Jefferson Stand-
ard plan, and in which it agreed to accept less than
the full amount due it, waived all sums in excess
thereof and continued to do so in the various re-
visions of the plan, thus creating an equity for cer-
tificate holders. The court, on the petition of a bond-
holder, ordered that the Schostak plan, to pay
$382,997.40 for 50,000 shares of stock of the Detroit
Grand Park Corporation, and the further sum of
$108,000 to the Detroit Trust Company for its
claims, be accepted as the most advantageous to
certificate holders, and that upon making these pay-
ments Schostak be subrogated to all the claims of
the Detroit Trust Company for advances, et cetera.
The order made further provision for the payment
of fees of the attorneys for the bondholders' com-
mittee and the sum of $2,000 for Mr. Mason, a mem-
ber of the bondholders' committee, Mr. Stanton, the
other member of the committee, having made no
claim for compensation. It also made provision for
payment of the Chicago depositary. It further pro-
vided that if the Schostak proposal was not com-
pleted and consummated, the Detroit Trust Com-
pany be ordered to accept $108,000 out of the corpo-
rate funds for payment of its advances, fees for
counsel, services, et cetera, and for certificates for
bonds amounting to $186,700, which certificates
should then be cancelled. It further provided that
the fees of Henry Meyers, friend of the court, be
determined after hearing and the same be paid
from the moneys deposited with the clerk of the

court as a charge for the services rendered. It further provided that the friend of the court be appointed and directed to represent the bondholders' committee if an appeal should be prosecuted, but not exclusive of other legal representatives, and that the friend of the court should mail a letter to all certificate holders setting forth the history of the proceedings. The court reserved jurisdiction to make such further findings and further orders as might be necessary.

The Detroit Trust Company on appeal states that the main question is whether it, as a creditor of a trust of which it is also trustee, can be compelled by court order to accept $108,000 in full payment of the sum of $384,639.86 due under prior decree of the court and compensation for services for 12 years and for the cancellation of $186,700 of bonds, all without its consent or agreement to do so and against its objection and protest and without any legal or moral consideration for so doing.

The record shows that the hotel was run at a tremendous loss for many years. The friend of the court stated in the oral argument that he had no criticism to make in regard to the trust company's management. The testimony indicated that the hotel was now being run at a large profit, probably due to war conditions, but it is highly speculative as to whether or not this profit will continue after the war. It is shown that the profit at the present time amounts to possibly $150,000 a year or thereabouts, less, of course, income taxes which are estimated at 40 per cent. However, it is pointed out by the attorney for Schostak that no provision whatsoever is being made for excess profit taxes. The trust company is criticized for incorporation for only $50,000. It is plain that the low capitalization of the Grand Park Corporation might possibly make

the company liable for very large excess profit taxes which would leave a net profit of a comparatively small amount. The record does not show that the trust company took the question of excess profits into consideration. The income of the corporation was increasing, particularly during a period prior to the time when plaintiff continued to express its willingness to accept $108,000, if the amended Jefferson Standard plan was adopted. It is difficult to conceive that the Detroit Trust Company filed its petition with any donative intent. It stated very frankly that it was satisfied to accept $108,000 so as to create a potential equity for the bondholders, the value of which the attorney for the bondholders admitted was very problematical. Even if there was a gift, and we do not find that there was one, it was solely for the benefit of the bondholders for whom the trust company still was the trustee. The trust company distinctly asked for the approval of its petition or any modification the court might see fit to make. The trust company owed a duty to the bondholders; it stood in a fiduciary relationship; it came into a court of equity for the purpose of bringing the trust to an end and disposing of the property. The court made no modification of the trust company's proposal in regard to its individual claim. It modified it as to certificate holders in conformance with the prayer of the bill.

It is not for us to say whether or not it was good business for the trust company to accept $108,000. The money had been lost in an unsuccessful venture. A vice president of the trust company testified that he wanted the original Jefferson Standard plan consummated; that there was no other plan that he believed was as good and which would be possible to consummate; that he did not want to run the risk of losing the one he had; that he would not refuse to

reduce the indebtedness down to $108,000 for other plans just because these would not be the trust company's plan; that, if the Jefferson Standard plan went through, the trust company would get $108,000 and would have no further interest in the project; that he did not want to propose a plan that in his opinion would not be a feasible one, a workable one, a fair one which in some way made provision for the bondholders; and that he was trying to work out the trust company's problem and also to help the bondholders. He did state that he objected to the other plan because he wanted a plan to go through that would be feasible and would put the enterprise in a sound position where it would have an opportunity to advance in a good sound financial condition and be able to weather the storms of the future. He claimed that only the Jefferson Standard plan accomplished this. He also stated that he thought the trust company could get $108,000 for its claim very quickly if it wanted to put no other conditions on it. He stated, however, that the trust company had two interests: a monetary interest of its own and a desire to do something for the bondholders. As appellant, however, the trust company claims that its action also constituted a gift to a third party, and that it had a legal right to make such gifts to such persons as it saw fit and it was under no legal obligation, nor could it be compelled, to make a gift to any one other than persons whom the donee or donees had selected. From a careful reading of the record and considering the staggering loss that had theretofore been incurred in the operation of the hotel, and considering also its present prosperity and future prospects, much depending upon income taxes and possible excess profit taxes, the question immediately arises whether plaintiff after its long and unfortunate past experience with the property

was not willing to accept a loss, get back $108,000 and reinvest it in a gainful manner. Unfortunately, plaintiff was in a somewhat dual position. As a creditor, it had its own corporate interest to protect, and at the same time, it acted as trustee for the bond-holders. One of its officers was chairman of the bond-holders' committee and the president of the Grand Park, and one of its employees was secretary to the Grand Park. Plaintiff had an absolute right to pro-tect its investment, but it had also accepted a trust on becoming trustee of the bondholders. Even had there been a gift, and we find none, it would have been to the bondholders to whom the trust company owed a duty. It was a liquidating trustee for their benefit and was bound by law to carry out its duties toward them with great fidelity and administer the trust solely in the interest of the beneficiaries. 1 Restatement of Trusts, § 170. It was under a duty to the beneficiaries in administering a trust not to be guided by the interests of any third person, and it would be improper for the trustee to sell trust prop-erty to a third person for the purpose of benefiting this party instead of the estate. 1 Restatement of Trusts, § 187, p. 482. Plaintiff came into court stat-ing that it had been unable to develop any other plan which afforded the certificate holders the opportu-nity to salvage anything; that the plan proposed was for the best interests of the certificate holders; that its offer to accept $108,000 was made with the firm belief that the total sums due it could not be obtained by sale of the property, or otherwise, and the re-ductions of the plan afforded the only possible means of creating some equity or potential equity for cer-tificate holders which would have material value.

Plaintiff came into a court of equity with a sworn petition making the proposal. It called attention to

the decree wherein the court had reserved the power to make modifications or changes, and asked for the court's approval and authority to carry out the plan as set forth in all particulars "or as to this court shall seem expedient and for the best interests of all concerned." The proposal was in writing signed by the trust company. The language must be most strictly construed against the person responsible for it. *Fort Pitt Malleable Iron Co.* v. *Detroit Steel Products Co.,* 260 Mich. 683. Nor is the claim that this agreement was without consideration a tenable one under Act No. 238, Pub. Acts 1941 (Comp. Laws Supp. 1943, § 13433–1 *et seq.,* Stat. Ann. 1943 Cum. Supp. § 26.978 [1] *et seq.*):

"SECTION 1. An agreement hereafter made to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration: Provided, That the agreement changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest shall not be valid or binding unless it shall be in writing and signed by the party against whom it is sought to enforce the change, modification, or discharge."

Commitment having been made in the judicial proceeding, it is not subject to arbitrary withdrawal after the court had stated that it would accept it, as modified. We quote from a case where the facts are not even analogous, but wherein the correct principle is stated as follows:

"Obviously an offeror cannot play fast and loose in a case where judicial approval is required. If an offeror duly submits an offer for approval to a court, where such judicial approval is required, it would seem that such offer might not be withdrawn

pending approval proceedings, provided the latter were not unduly protracted." *Evans* v. *2168 Broadway Corp.*, 281 N. Y. 34, 40 (22 N. E. [2d] 152).

The trial court held that plaintiff had come into a court of equity and was bound to do equity. Plaintiff was correct in stating that the obligation to do equity does not extend to its foregoing a legal claim. Ordinarily a court could not make a mortgagee in a foreclosure suit waive part of its mortgage, but we have a different situation here. The trust company of its own volition presented a petition to the court agreeing to accept $108,000 in full for its interests. It frankly stated that on account of untoward conditions presented, it proposed to accept such amount in full settlement of its interests and thereby salvage something which appeared to be of doubtful value for the certificate holders. It asked the court's approval of the plan or any modifications the court might see fit to make. The court did not ask the trust company to take less than it had proposed. It, however, ordered the company to accept the amount it had offered to take but under a modified order that would net the certificate holders approximately $12 instead of only 65 cents for each $100 in bonds represented by the certificates. Having thus submitted itself to a court of equity, it was bound to do what the court should find equitable under the circumstances. With its equitable powers the court had the right and duty to look after the interest of the certificate holders and to that extent it was doing the very thing plaintiff indirectly had requested in its petition. The plaintiff did not withdraw its offer when the Jefferson Standard changed its plan and proposed to pay $9 per $100 to certificate holders coupled with the right to buy one share of stock for each bond represented by the cer-

tificate at $6 a share. In its original petition the plaintiff reserved for the court the right to modify its proposal as the court shall deem expedient and for the best interests of all concerned. The court found that it was to the best interests of all concerned to accept the Schostak plan which would give plaintiff the sum requested and return a larger amount to the bondholders than any other plan had offered.

Plaintiff on appeal further contends that the court had no right to appoint a friend of the court to attempt to obtain a loan from the R. F. C. Mortgage Corporation or, later, to solicit bids higher than the Jefferson Standard proposal in order to obtain more for the bondholders. A peculiar situation had arisen. The Jefferson Standard plan was the result of negotiations in which plaintiff, the bondholders' committee and Mr. Morris, employed by the Grand Park Corporation, had participated. Plaintiff urged the acceptance of the plan. The attorney for the bondholders' committee not only urged it but insisted upon it to the exclusion of any other possible plan. From the testimony offered, it was shown that a better plan was available which would give plaintiff the $108,000 it asked for and net more for the certificate holders. A very unfortunate colloquy took place wherein the attorney for the bondholders' committee plainly showed that he was interested only in the Jefferson Standard plan. The judge could not solicit other plans. He felt that, in fairness to the certificate holders, efforts should be made along this line and thereupon appointed Mr. Meyers friend of the court, not to make any decision for the court but to obtain other plans and make recommendations, the court reserving to itself the exclusive right to make the final determination. There is authority for the appointment and payment of a friend of the

court who aids in the performance of certain labors and examinations. See 3 C. J. S. p. 1048; 2 Am. Jur. p. 679; *In re St. Louis Institute of Christian Science,* 27 Mo. App. 633; *Mumma's Estate,* 2 Pa. Dist. 592; *State v. Gorman,* 171 Ind. 58 (85 N. E. 763). The question has not been frequently passed upon. We find no authority to the contrary. However we base our holding on the fact that no objection whatsoever was raised to the appointment of the friend of the court. In fact, the attorney for the bondholders' committee assisted in drafting the first order and appellants are foreclosed from making any objection at this time.

Some of the appellants claim that the final order of the trial court does not properly incorporate the proposal or offer submitted by Schostak. There might be some merit to this contention had not the question been settled in the discussion that took place in open court. This discussion left no doubt that Schostak proposed to pay $12.30 for each $100 unit represented by a certificate and based upon the total of 31,138 units remaining outstanding after those held by the trust company were excluded. On the payment of such amount, and $108,000 to the trust company, Schostak would become the beneficial owner of all of the capital stock held by the bondholders' committee and pledged to the trust company. The colloquy that took place removed all ambiguity. The court made the proper order.

Some of the appellants contend that the court could not make the order in view of the opposition of the holders of the certificates representing a large number but a minority of the deposited bonds. The holders of certificates representing a majority of such deposited bonds took no active interest in the proceedings. The certificate holders are bound by the deposit agreement and the original and the final

decrees of the court, each providing for the disposition of the property by the court.

We shall not discuss the comparative merits of other offers or plans presented by some of the appellants. We agree with the court that Schostak made the best offer and that under it certificate holders would presently 'receive a larger amount than under any other plan proposed. Over 14 years had elapsed since the bondholders, or their successors, the certificate holders, had realized anything whatsoever from the trust. It is true that the hotel is now showing a large profit, but it is speculative whether such condition will continue after the termination of the war. The foreclosure sale took place in 1932 after litigation that preceded it. The trust company wanted the trust wound up. The court had jurisdiction and properly exercised it.

Some of the appellants claim that because Grand Park is making an estimated profit of $150,000 a year (before Federal taxes) and because it has a large amount of cash on hand, the trust company in conformance with its petition should be paid $108,000 and the other fees should be liquidated in a similar manner by Grand Park. The stock thus freed from the trust company's claim should then be distributed to the certificate holders. This plan assumes that the owners of the leaseholds have made or are bound to make the same concessions. If they refuse, the amount of cash on hand would be seriously depleted. Under the Schostak plan, the purchaser must take his chances on the concessions being made, if they have not been made theretofore. If Grand Park must pay an excess profit tax, it will retain but a small proportion of its profits. It still remains highly speculative whether the hotel can be run at a profit after the war. The Schostak plan will net bondholders almost $12 for each $100 unit. We be-

lieve the trial judge was correct in ruling it was the best plan for bringing the trust to a close.

The trust company contends that it owes a duty to all creditors including the owners of the leased property. The decree does not relieve the Grand Park from any liability under the leases. If the trust company has any liability in its individual capacity, Schostak and his assignees must assume it, subject to their right to show that the trust company is not liable in its individual capacity. No part of any amount paid or to be paid because of such liability whether on the part of the Grand Park or the trust company can be deducted or paid out of the $12.30 per unit to be deposited by the purchaser. The decree can in no way affect the leases. The purchaser and his assignees by becoming owners of the capital stock of the Grand Park do not release the corporation from its liabilities.

We have endeavored to discuss such of the questions raised as have any merit. The length of this opinion precludes us from discussing any others.

The decree of the trial court is affirmed, subject to the slight modification in regard to the assumption by Schostak and his assignee of any individual liability the trust company may have to the owners of the leasehold properties or their representatives. The trial court properly has retained jurisdiction and the decree entered in this court will so provide so that any further questions that may arise including the mechanics of carrying out the decree may be determined by the trial court. Appellees will recover costs.

NORTH, C. J., and STARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred with BUTZEL, J.

WIEST, J. (*dissenting in part*). The decree should be modified by elimination of the compensation

awarded the so-called friend of the court. The court had no power, *sua sponte,* to appoint an *amicus curiae* to actively participate in activities of the parties litigant.